RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0184p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JESSICA FRYE,

*Plaintiff-Appellant*,

*v.*

No. 18-2056

CSX TRANSPORTATION, INC.; CONSOLIDATED RAIL
CORPORATION; ALAN GALLACHER,

*Defendants-Appellees*.

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:14-cv-11996—Stephen J. Murphy, III, District Judge.

Argued: May 7, 2019

Decided and Filed: August 5, 2019

Before: COLE, Chief Judge; STRANCH and READLER, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Mark E. Parrish, BOYD, KENTER, THOMAS & PARRISH, LLC, Independence,
Missouri, for Appellant. Joseph J. McDonnell, GALLAGHER SHARP LLP, Detroit, Michigan,
for Appellee. **ON BRIEF:** Mark E. Parrish, BOYD, KENTER, THOMAS & PARRISH,
LLC, Independence, Missouri, for Appellant. Joseph J. McDonnell, Mary C. O'Donnell,
GALLAGHER SHARP LLP, Detroit, Michigan, for Appellee.

---

**OPINION**

---

CHAD A. READLER, Circuit Judge. Tragedy befell thirteen-year-old Shyan Frye. While walking her bicycle over a rail crossing in Huron Township, Michigan, she was struck by an oncoming train. The collision proved fatal.

In the aftermath of this tragedy, Shyan's mother, Plaintiff Jessica Frye, brought suit against Defendants CSX Transportation, Inc., the train's owner; Alan Gallacher, the train's conductor; and Consolidated Rail Corporation, or "Conrail," the owner of the track. The claims against Gallacher were resolved in his favor at summary judgment, and the remaining claims were submitted to a jury. The jury, in turn, returned a verdict in favor of Defendants CSX and Conrail.

On appeal, Frye challenges numerous aspects of the proceedings below. She takes issue with the district court's entry of summary judgment for Gallacher. And she takes issue with a host of rulings at trial. They include: The district court's refusal to strike potential juror Jay Lodge for cause during voir dire; two evidentiary rulings by the district court, one admitting evidence of the potential side effects of an anti-depressant Shyan was taking at the time of her death, and another excluding photographs of the railroad crossing after it was resurfaced; and finally, the district court's refusal to give a jury instruction regarding the heightened duty of care imposed on tortfeasors when children are present.

We find no error in the district court's summary judgment ruling nor in its handling of the trial proceedings. In a case born out of tragedy and presenting challenging legal issues, the district court allowed the jury to assess the defendants' culpability against the backdrop of the proper legal framework. We accordingly **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

On April 15, 2011, Shyan Frye, a thirteen-year-old eighth-grade student, was struck and killed by a train while walking her bicycle over a single-track crossing.  The train was operated by CSX and manned by two CSX employees:  Craig Fischer, the engineer, and Defendant Alan Gallacher, the conductor.  At the time of the accident, the train was traveling below the applicable speed limit, and its horn sounded for approximately 20 seconds before it reached the crossing—more than required by federal law.  *See* 49 C.F.R. § 222.21(b)(2).

The crossing was owned and maintained by Conrail.  Conrail had equipped the crossing with signal bells and lights that activated as intended nearly 40 seconds before the train arrived at the crossing.  The accident occurred on a clear day when oncoming trains were fully visible.

### A.      The Parties Present Differing Explanations As To The Cause Of The Train Accident.

Fischer and Gallacher were the only witnesses to the accident.  According to their testimony, Shyan came into view of the train crew approximately 40 seconds before the accident.  Both Fischer and Gallacher testified that they witnessed Shyan walk onto the track while straddling her bicycle.  When the train was roughly a quarter-mile from the crossing, Fischer applied the train's emergency brakes, realizing a collision was imminent.  Shyan never looked up at the train before it struck her.

Why did Shyan remain on the tracks in the face of an oncoming train?  That question, more than any other, divided the parties below.  Frye asserted that Shyan's bicycle tires became stuck in the poorly maintained tracks as she made her way through the crossing.  Photographs admitted at trial revealed large gaps in the crossing in which a bicycle tire could have become lodged.

Defendants advanced a different narrative, one that turned on Shyan's mental state.  Defendants elicited testimony indicating that Shyan was struggling with school and was at risk of having to repeat eighth grade.  She also struggled with weight problems.  At the time of her death, she was taking Adderall for ADHD and Celexa to offset Adderall's side effects.  An autopsy found Celexa present in Shyan's liver.

Throughout the proceedings below, Defendants emphasized that suicidal ideation was a potential side effect of the medication Shyan was taking.  Frye responded with a motion in limine to exclude testimony of this kind at trial, describing it as irrelevant and substantially more prejudicial than probative.  The district court denied the motion but also instructed Defendants to lay the proper foundation for the testimony at trial.  During the ensuing trial proceedings, Defendants proffered the testimony of Dr. Scott Somerset, who performed the autopsy, and Dr. Bradford Hepler, the Wayne County toxicologist, to describe Celexa's potential side effects.  Both doctors testified that Celexa is an anti-depressant capable of causing suicidal thoughts in children consistent with warnings issued by both the Food and Drug Administration and the drug's manufacturer.  The district court admitted the testimony.

**B.       The District Court Enters Summary Judgment For Gallacher, And The Remaining Defendants Proceeded To Trial.**

Prior to trial, Defendants moved for summary judgment on all issues.  The district court entered summary judgment in favor of Gallacher, the conductor, rejecting Frye's argument that CSX's operating procedures, which assigned the conductor responsibility to assist the engineer in stopping the train, created a legal duty to do so on the part of the conductor.  The district court found that Frye did not argue that Gallacher was under any state-law duty to stop the train independent of the operating procedures; nor did she cite any Michigan authorities to that effect.

As to the remaining Defendants, the district court concluded that Frye had abandoned all but four of her claims—two against CSX, one for failing to slow the train and another for failing to sound the train horn properly, and two against Conrail, one for failing to maintain the crossing and another for failing to train employees regarding inspection and repair of the crossing.  The district court concluded that no reasonable jury could find that CSX failed to sound the train horn properly and accordingly entered summary judgment on that claim.  The remaining claims were allowed to proceed to trial.

During voir dire, Frye moved to strike Jay Lodge, a potential juror, for cause.  Frye's motion was based on Lodge's ownership of a consulting company that did business with the Department of the Army.  Although Lodge was party to a non-disclosure agreement with the government regarding his business, he explained in general terms that his company assists the

federal government in soliciting tenants for unused railyard and storage facilities in government-owned ammunition plants. While some of those prospective tenants are railroad companies, Lodge's company did not have a direct financial interest in whether prospective tenants ultimately entered into a lease with the government. On multiple occasions, the district court asked Lodge whether he had a financial interest that would prevent him from being a fair and impartial juror. Each time he responded that he did not. The district court denied Frye's motion to strike Lodge for cause, but he was later discharged when Frye used a peremptory challenge to strike him.

During the trial's evidentiary phase, Frye attempted to introduce photographs of the crossing after it had been resurfaced following the accident. The resurfacing was done pursuant to an order of the Michigan Department of Transportation. The district court, however, excluded those photographs, finding them to be inadmissible evidence of subsequent remedial measures.

## C.    Following Instructions And Deliberations, The Jury Returns A Verdict For Defendants.

At the close of evidence, the district court instructed the jury on the law to apply to the evidence adduced at trial. Among those instructions was one requested by Defendants (and commonly given in Michigan train collision cases) regarding the duty of a train engineer. Consistent with Michigan law, the jury was instructed that engineers are entitled to presume that a person standing on railroad tracks will move off in time to avoid a collision:

> Until it becomes apparent otherwise, a train engineer is entitled to presume that a person on the tracks will get off or that a person approaching the tracks will stop in time to avoid the danger. An engineer may also assume that a person on or near the tracks will exercise ordinary care. When a person is on the tracks, as opposed to approaching them, a train engineer is bound to slow or stop the train for those who are apparently unaware of the danger and do not hear or notice warning signals.

In view of that instruction, Frye requested that the district court also give Michigan Civil Jury Instruction 10.07, a more general instruction sometimes given in tort cases involving children. It would have instructed the jury to impose a higher duty of care on a defendant that had reason to believe children may be in the vicinity:

The law recognizes that children act upon childish instincts and impulses. If you find the defendant knew or should have known that a child or children were or were likely to be in the vicinity, then the defendant is required to exercise greater vigilance, and this is a circumstance to be considered by you in determining whether reasonable care was used by the defendant.

The district court declined to give that instruction, finding that it was not applicable to cases involving train collisions in light of the more specific instruction regarding train crews. Nevertheless, the district court, believing that Frye was entitled to some instruction regarding Shyan's status as a minor, instructed the jury to hold Shyan to the standard of care expected of a reasonable thirteen-year-old under the circumstances:

It was the duty of Frye's decedent, Shyan Frye, in connection with this occurrence, to use ordinary care for her own safety. A minor is not held to the same standard of conduct as an adult. When I use the words "ordinary care" with respect to Shyan Frye, I mean that degree of care which a reasonably careful minor of the age, mental capacity and experience of Shyan Frye would use under the circumstances which you find existed in the case. It is for you to decide what a reasonably careful minor would do or would not do under such circumstances.

At the close of trial, the jury found for Defendants on all claims. As to CSX, the jury found that it was not negligent. As to Conrail, the jury found that while the company was negligent, its negligence was not a proximate cause of Shyan's death. The district court entered judgment on the verdict.

Frye filed a motion for a new trial. In it, she challenged (1) the admission of testimony regarding Celexa's side effects, (2) the district court's refusal to give Michigan Civil Jury Instruction 10.07, (3) the district court's entry of summary judgment in favor of Gallacher, (4) the exclusion of photographs of the resurfaced crossing, and (5) the district court's refusal to strike potential juror Lodge for cause. The district court denied the motion. This timely appeal followed.

## II. ANALYSIS

**A.    The Evidence of Celexa's Potential Side Effects Was Properly Admitted.**

We review a trial court's evidentiary ruling under an abuse of discretion standard. *Ayers v. City of Cleveland*, 773 F.3d 161, 169 (6th Cir. 2014). Generally speaking, we will overturn a

district court's decision to admit or exclude evidence only if we are firmly convinced of an error below.  *Id.*

Defendants sought to admit the Celexa side-effect evidence on the grounds that it assisted the jury in explaining Shyan's behavior on the day of the accident.  Frye argues that the evidence should have been excluded on relevance grounds under Federal Rules of Evidence 401 and 402 or, alternatively, as more prejudicial than probative under Federal Rule of Evidence 403. We disagree.

### 1.    *The Side-Effect Evidence Was Relevant Under Federal Rule Of Evidence 401.*

Federal Rule of Evidence 401 instructs that evidence is relevant if it has any tendency to make a fact of consequence in determining the action more or less probable.  As indicated by its use of the phrase "any tendency," the Rule 401 standard is extremely liberal.  *Id.*  And it is satisfied here.  Trial testimony revealed that Shyan stood on or near the tracks for at least 19 seconds (and up to 40 seconds) while a train was headed in her direction.  Whether her decision could have been impacted by suicidal thoughts caused by the use of Celexa plainly had at least some probative value in explaining why Shyan remained in the train's path.  This is all that Rule 401 requires.

### 2.    *The Side-Effect Evidence Was Not More Prejudicial Than Probative Under Federal Rule Of Evidence 403.*

Unless expressly proscribed by another evidentiary rule, relevant evidence is admissible by operation of Federal Rule of Evidence 402.  Frye says such admission is proscribed here by application of Federal Rule of Evidence 403.  That rule, of course, allows a trial court to exclude relevant evidence if its probative value is substantially outweighed by the risk that it may unfairly prejudice one of the parties.  *Id.*  With respect to the first aspect of the weighing analysis, we are confident of the evidence's probative value.  That Shyan could have been experiencing suicidal thoughts as a result of taking Celexa offers a plausible explanation for why she may have stood on the tracks for up to 40 seconds prior to being struck by an oncoming train.

In response, Frye argues that whatever the Celexa evidence's probative value may have been, its admission was deeply and unfairly prejudicial to her case.  She cites two cases to

support the point. They are two out-of-circuit decisions, one state, one federal, however, and thus non-binding. More than that, they are easily distinguishable, primarily because they involved accidents where, unlike here, the plaintiff's conduct or state of mind was largely irrelevant.

*Ratner v. General Motors Corp.* addressed a car crash allegedly caused by a defective accelerator. 241 N.J. Super. 197, 205–06 (1990). The defendant manufacturer sought to introduce evidence that the plaintiff had been taking prescribed medication to treat her hypertension. And, after establishing that fact, the defendant then wanted to list for the jury the medication's potential side effects. The trial court barred admission of the side-effect evidence. But in doing so, the court emphasized the way in which that case was very different from this one. The medical evidence at issue there (unlike here) had no tendency to prove or disprove the primary issue in the case: whether the accelerator was defective. Absent from the record was any foundational evidence that the plaintiff might have suffered from side effects that could have been a contributing cause of the accident. But had such evidence existed, the side-effect evidence may well have been admitted. After all, as the court observed, "[t]he question of its admissibility in a particular case is fact sensitive." *Id.*

Here, the record below favored admission. The pivotal issue at trial was not whether any component of the train was defective, but rather why Shyan remained on the track. Foundational evidence established that she did so for up to 40 seconds. That evidence coupled with evidence about her physical and mental health issues made her state of mind squarely relevant to the fact finder. For that reason, evidence showing the effect her medication may have had on her mental state was properly admissible.

Equally unavailing is *Celaya v. Hankook Tire America Corp.*, No. CV-11-00429, 2016 WL 10611188 (D. Ariz. March 30, 2016). In *Celaya*, the decedent was killed when his car overturned after a tire tread detachment. While the district court there prohibited the defendants from introducing a toxicology report showing that the decedent had trace amounts of marijuana and multiple pain medications in his system at the time of the crash, it did so primarily because the case turned on the faulty manufacturing of a tire, not the decedent's potential drug use. Understandably, the court was concerned about the special prejudice a plaintiff suffers when

generic toxicology evidence, with little or no potential to explain material facts, is introduced in the context of a product defect case.

Today's case, on the other hand, turns largely on the actions of the decedent, not the defendants. Frye was permitted to introduce evidence of gaps in the crossing surface in which Shyan's bicycle tires may have become stuck to explain to the jury why she would have stood in the path of an oncoming train. Likewise, Defendants were properly permitted to explain that same conduct by introducing evidence that Shyan may have been having suicidal thoughts as a result of taking Celexa. Frye is correct to note that one cannot know with certainty that Shyan was in fact experiencing these side effects. But the same can be said of Frye's theory regarding the bicycle tires. And in any event, certainty is not the governing standard for admission under the Federal Rules of Evidence.

All told, the district court did not abuse its discretion in admitting the Celexa evidence. The court took note of Frye's concerns about prejudice by instructing Defendants to lay a proper foundation before introducing the Celexa side-effect evidence. Defendants complied with these instructions at trial. The great deference afforded to trial courts in making evidentiary decisions was not exceeded in this case. *Broad Street Energy Co. v. Endeavor Ohio, LLC*, 806 F.3d 402, 409 (6th Cir. 2015).

**B.    The District Court Did Not Err By Refusing To Give Michigan Civil Jury Instruction 10.07.**

Next, Frye contends that the district court erred by failing to give Michigan Civil Jury Instruction 10.07, a general instruction regarding a child's "instincts and impulses." Although state substantive law governs the content of jury instructions in diversity cases, federal procedural law governs the review of the propriety of those instructions. *King v. Ford Motor Co.*, 209 F.3d 886, 897 (6th Cir. 2000).

Individual jury instructions are not reviewed in isolation. *Johnson Controls, Inc. v. Jay Indus., Inc.*, 459 F.3d 717, 726 (6th Cir. 2006). Rather, we review the entire body of instructions, and we reverse only when three criteria are met: "(1) the omitted instructions are a correct statement of the law; (2) the instruction is not substantially covered by other delivered

charges; and (3) the failure to give the instruction impairs the requesting party's theory of the case." *Id.* (quoting *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 449 (6th Cir. 2000)). We review a district court's refusal to give a requested jury instruction for an abuse of discretion, *id.*, and review *de novo* its determination regarding the legal accuracy of those instructions. *Smith v. Joy Techs., Inc.*, 828 F.3d 391, 397 (6th Cir. 2016).

It is a close question whether Frye's proposed instruction fails the first criteria. Instruction 10.07, while correct as a general presumption in tort cases involving children, runs up against a more specific presumption applicable to this case—one addressing train accidents. *See Tomes v. Detroit, T. & I.R. Co.*, 215 N.W. 308, 309–10 (Mich. 1927). That is: Until it becomes apparent otherwise, train crew members can reasonably assume a person on the tracks—adult or child—will move off the tracks in time to avoid a collision. *See id.*

*Tomes* is factually similar to this case. In *Tomes*, a thirteen-year-old girl was struck and killed by a train while walking on tracks near her home. As the girl suffered from no apparent disability and there was no obstruction of the girl's view at the crossing, the court found the defendant railway free of negligence. Absent a clear indication otherwise, said the Michigan Supreme Court, the engineer there could reasonably assume the girl would move off the tracks before the collision. *Id.* That is true under Michigan law for children even younger than the victim in *Tomes*. *See Trudell v. Grand Trunk Ry.*, 85 N.W. 250, 252–53 (Mich. 1901) (finding that it was reasonable for a train engineer to assume that a seven-year-old would step off the track in time to avoid a collision); *see also Berlin v. Chicago & N.W. Ry.*, 246 N.W. 191, 191 (Mich. 1933) (finding the same regarding a nine-year-old).

So too here. Though Shyan was a minor, there is nothing in the record to suggest she was incapable of recognizing the danger posed by an oncoming train. Her view at the crossing was unobstructed, the train's horn sounded, and the crossing's signal bells and lights activated. Under these circumstances, the train crew, like the train crew in *Tomes*, was under no duty to stop the train until it was clear Shyan would not step away from the track. And by that time, the collision was unavoidable, given the great difficulty in stopping a train.

Compelled by Michigan law to instruct the jury as it did regarding reasonable assumptions made by train crews, the district court nevertheless did not ignore Frye's request entirely. Rather, it gave a modified version of Frye's requested instruction, explaining to the jury that Shyan should be held only to the standard of care applicable to a thirteen-year-old under the circumstances. Frye was entitled to no more under Michigan law.

**C.  The District Court Properly Entered Summary Judgment In Favor Of Conductor Gallacher.**

Frye also challenges the district court's entry of partial summary judgment in favor of Gallacher, the train conductor. We review the district court's entry of summary judgment *de novo*. *Adair v. Charter Cty. of Wayne*, 452 F.3d 482, 486 (6th Cir. 2006).

We can quickly resolve two threshold appealability challenges made by Defendants. The first is Defendants' contention that Frye's notice of appeal was untimely. We echo the notion that appeal deadlines must be taken seriously. From time to time, those deadlines can trip up an appealing party, even in ways fatal to an appeal. *See Bowles v. Russell*, 551 U.S. 205, 214 (2007). But this is not one of them. The time to appeal partial summary judgment does not begin to run until the district court either enters final judgment in the case or certifies the partial order for immediate appeal. *See Jalapeno Prop. Mgmt., LLC v. Dukas*, 265 F.3d 506, 513–14 (6th Cir. 2001) (construing Fed. R. Civ. P. 54(b)). Frye's time to appeal commenced only after the district court denied her motion for a new trial on August 19, 2018. Her September 13, 2018 notice of appeal was thus timely. Fed. R. App. P. 4(a)(1)(A).

Second, Defendants contend that Frye forfeited any appellate arguments with respect to Gallacher by failing to object to a jury instruction that explicitly stated that Gallacher was not liable. But the reason Frye did not object is a simple one: The district court had already entered summary judgment in favor of Gallacher. In that posture, Frye was not required to object to a prior definitive ruling by the district court. *See K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 174–75 (6th Cir. 1996) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 118–20 (1988) ("Although the same legal issue was raised both by those [motions for judgment as a matter of law] and the jury instruction, the failure to object to an instruction does not render the instruction the law of the case for purposes of appellate review. . . .") (internal quotations and

citations omitted)); *see also* Fed. R. Evid. 103(b) ("Once the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal.").

With these procedural hurdles cleared, we turn to the merits of Frye's challenge to the district court's entry of summary judgment in favor of Gallacher.

> 1. *CSX's Internal Operating Procedures Did Not Place A Legal Duty Upon Gallacher To Slow Or Stop The Train.*

Under Michigan law, before liability in tort can be attributed to a defendant, the plaintiff must establish that a legal duty governed the defendant's conduct. *Romain v. Frankenmuth Mut. Ins. Co.*, 762 N.W.2d 911, 913–14 (Mich. 2009). At summary judgment, Frye argued that CSX's internal operating procedures and code of conduct for employees placed a legal duty upon Gallacher to stop the train before impact. But that argument was easily, and correctly, rejected by the district court, given the perverse incentives such a rule would create. *Frye v. CSX Transp., Inc.*, No. 2:14-cv-11996, 2017 WL 4120102, at *7 (E.D. Mich. Sept. 18, 2017). After all, as the Michigan courts have recognized, if internal policies could serve as a basis for a legal duty, defendants might well avoid implementing such policies for fear of creating liability where none would otherwise exist. *Zdrojewski v. Murphy*, 657 N.W.2d 721, 729 (Mich. App. 2002); *see also Buczkowski v. McKay*, 490 N.W.2d 330, 332 n.1 (Mich. 1992) ("Imposition of a legal duty on a retailer on the basis of its internal policies is actually contrary to public policy. Such a rule would encourage retailers to abandon all policies enacted for the protection of others in an effort to avoid future liability."). Michigan courts would not impose a duty upon Gallacher on the basis of CSX's operating procedures, and we likewise decline to do so as a matter of Michigan law.

> 2. *Frye Forfeited Any Argument That Michigan Law Independently Imposed A Duty On Gallacher To Stop The Train.*

Frye alternatively asks us to find that Michigan law independently imposed a duty upon Gallacher to avoid the collision. For us to do our part, however, Frye must first have done hers. She needed to make a timely request to the district court to rule upon the issue. Her failure to do so dooms her arguments on appeal. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th

Cir. 2008) (holding that issues not fully presented to the district court are deemed forfeited on appeal unless exceptional cases or particular circumstances are present, or the rule would produce a plain miscarriage of justice).

By way of background, in her opposition to Defendants' motion for summary judgment, Frye argued that CSX's internal operating procedures placed Gallacher under a legal duty to help stop the train. She did not argue that Michigan law *independently* placed a similar duty upon Gallacher; nor did she cite Michigan authority for that proposition.

Raising one argument did nothing to preserve another. *See Sigmon Fuel Co. v. Tenn. Valley Auth.*, 754 F.2d 162, 164 (6th Cir. 1985). In *Sigmon*, this Court refused to consider the plaintiff's argument on appeal that he was entitled to prejudgment interest and attorney's fees under federal common law. Before the district court, the plaintiff made statutory arguments for recovering the fees and interest. But he did not mention federal common law as an additional ground for recovery. And that silence spoke volumes, at least when it came time to resolve plaintiff's subsequent appeal. Because the plaintiff did not make his common law argument below, we held that the argument was forfeited on appeal. *Id.* Frye was similarly required to articulate each specific legal basis for imposing a duty upon Gallacher that she would like to pursue on appeal.

Sometimes, a party may make a vague or incomplete reference to an argument below and then seek to raise that argument on appeal. Such cases can raise different questions regarding preservation and forfeiture. *See, e.g.*, *Thurman v. Yellow Freight Sys., Inc.*, 97 F.3d 833, 835 (6th Cir. 1996) (holding that vague references to an issue fail to preserve it for appeal). But thanks to the district court, there is no confusion here whether Frye made her state law argument below. She did not. In its order granting summary judgment, the district court explained that it understood Frye as arguing that the only duty placed upon Gallacher came from CSX's internal operating procedures: "Frye's claim against Gallacher rests solely on CSX's own rule that imposed upon Gallacher a duty to act if Fischer failed to do so." Frye neither asked the district court to reconsider its ruling nor otherwise objected that her argument had been misunderstood until her motion for a new trial—after the case was tried to a jury and a verdict was returned for Defendants.

Because Frye argued that Gallagher had a legal duty to slow the train under Michigan law for the first time in her motion for a new trial, the district court properly deemed the argument untimely. A plaintiff typically may not wait until the district court has already entered judgment to raise new arguments. *See Flowers*, 513 F.3d at 552–53; *Thurman*, 97 F.3d at 835. We therefore decline to reach the merits of Frye's second argument.

**D.        Any Error By The District Court In Refusing To Admit Photographs Of The Resurfaced Crossing Was Harmless.**

Frye argues that the district court erred in invoking Federal Rule of Evidence 407, which limits the grounds for admitting evidence of "subsequent remedial measures," to exclude from evidence photographs of the resurfaced crossing. A trial court's evidentiary decisions are reviewed for abuses of discretion and are not lightly overturned. *Nolan v. Memphis City Sch.*, 589 F.3d 257, 264–65 (6th Cir. 2009).

Ordinarily, evidence of a subsequent remedial measure is not admissible at trial to establish a party's negligence or culpable conduct. *See* Fed. R. Evid. 407; *see also Yates v. Ortho-McNeil-Janssen Pharm, Inc.*, 808 F.3d 281, 292 (6th Cir. 2015). That is so, we and many others have observed, because the risk of such admission might discourage a party from otherwise remedying a potential safety hazard. *Smith v. United Broth. of Carpenters and Joiners of Am.*, 685 F.2d 164, 169–70 (6th Cir. 1982) (Keith, J., concurring); *see also* Advisory Committee's Notes on Fed. R. Evid. 407. Whatever harm may have been caused already, and regardless who is at fault for that harm, a party should not be dissuaded from minimizing the risk of future harm for fear that such remedial measures will be used against the party to establish its liability for the originating accident. Put more simply, a good deed should go unpunished.

Resurfacing a hazardous railroad crossing following an accident might strike one as a quintessential subsequent remedial measure. But Frye, to her credit, has a counterpoint. The remedial measure, she notes, seemingly was not done voluntarily, but rather by order of the Michigan Department of Transportation, a regulatory authority. And where a subsequent remedial action is compelled, not voluntary, the remedying party has not undertaken a good deed, at least not without compulsion.

But even if Frye could show an abuse of discretion in excluding photographs of the resurfaced crossing (and we offer no opinion on the matter), any error in excluding them was harmless. *See Harnden v. Jayco*, 496 F.3d 579, 583 (6th Cir. 2007) (quoting Fed. R. Civ. P. 61) (finding evidentiary ruling harmless if it "does not affect the substantial rights of the parties.")). If admitted, the photographs would have served only to help prove that Conrail was negligent in maintaining the crossing. But the jury already found that Conrail was negligent. And critically, it also found that Conrail's negligence was not a proximate cause of Shyan's death.

It is hard to see how pictures of the crossing as resurfaced one year after the incident would show anything about causation at the time of the accident. That is especially true when, as revealed by the jury's verdict, pictures of the crossing from the time of the incident did not establish causation. Equally true, if admitted, the photographs of the resurfaced crossing presented added risk of prejudice and confusion. Under these circumstances, any potential error regarding application of Rule 407 was harmless.

### E.     The District Court Did Not Abuse Its Discretion In Refusing To Strike Prospective Juror Lodge For Cause.

Finally, Frye contends that the district court erred by denying her motion to strike Juror Lodge for cause. Voir dire revealed that Lodge owned a consulting company that worked indirectly with railroad companies like CSX. Although Lodge was stricken peremptorily and took no part in the jury's deliberations, Frye argues that the fact she was forced to use a peremptory challenge on Lodge constitutes reversible error. The district court's decision to exclude a juror for cause is reviewed for an abuse of discretion. *United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006).

Jurors are presumed to be impartial, a presumption that can be overcome where the moving party can show grounds for actual bias. *Id.*; *Treesh v. Bagley*, 612 F.3d 424, 437 (6th Cir. 2010). We see nothing in the record, however, to suggest that Lodge was actually biased in favor of Defendants. In response to the district court's questions, Lodge explained that his consulting company merely provided staffing support in leasing unused government railyard and storage facility space. He did not have a financial interest in the actual leasing of the space by

rail companies. Lodge further indicated that his ownership of the business would not interfere with his ability to be an impartial juror.

In the absence of a finding of actual bias, Frye contends that the district court alternatively should have found implied bias. The doctrine of implied bias, if it applies at all, applies only in extreme cases in which the relationship between the juror and some aspect of the litigation makes it "highly unlikely that the average person could remain impartial." *Treesh*, 612 F.3d at 437; *see also English v. Berghuis*, 900 F.3d 804, 816 (6th Cir. 2018) (noting that the "continued vitality of the [implied bias] doctrine has been called into question by the Supreme Court."). *Treesh* lists as examples of implied bias scenarios in which a juror is related to one of the parties or was directly involved in the incident at issue in the case. 612 F.3d at 437. Those examples are a far cry from this case. The mere possibility of indirect business dealings with companies like CSX would not make the average person highly unlikely to consider the case impartially. *See id.* (finding no implied bias where the defendant was the former teacher of one of the jurors).

At most, Frye's cases stand for the proposition that present and direct financial interests may, depending on the circumstances, make the average person highly unlikely to act impartially. For instance, in *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1122–23 (10th Cir. 1995), a slip-and-fall case filed against Wal-Mart, the Tenth Circuit held that bias could be presumed where a potential juror was a stockholder in Wal-Mart and his wife was a Wal-Mart employee. Yet even in that cozy setting, any error in not excluding the juror at issue was deemed harmless, where (as here) the plaintiff subsequently used a peremptory challenge to exclude the juror. *Id.*

Equally unavailing is Frye's argument that Lodge's non-disclosure agreement with the government may have concealed evidence of bias. As a factual matter, that agreement did not prevent Lodge from describing his business activities in terms sufficient to identify any potential financial interest in the case. It bears repeating that jurors are presumed to be impartial. Absent any concrete evidence of prejudice, the presumption of impartiality stands. *United States v. Maxwell*, 160 F.3d 1071, 1077 (6th Cir. 1998). So does the verdict below.

## III. CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.